# United States Court of Appeals
## For the First Circuit

No. 21-1197

JAMES GARREY,

Petitioner, Appellant,

v.

SHEILA CREATON KELLY, Superintendent of MCI-Concord,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lipez, Howard, and Kayatta,
Circuit Judges.

David J. Nathanson, with whom Wood & Nathanson, LLP was on brief, for appellant.

Eva M. Badway, Assistant Attorney General, Criminal Bureau, with whom Maura Healey, Attorney General, was on brief, for appellee.

December 12, 2025

**HOWARD**, **Circuit Judge**.  A person may not be excluded from a jury because of that person's race, and a prosecutor in a criminal case may not on that basis exercise a peremptory challenge to prevent a venireperson from serving on the jury.  Whether such an improper challenge was erroneously allowed in a Massachusetts murder prosecution is the question that lies at the heart of this appeal.  Our task is further complicated by the question of what to make of a less-than-clear state trial record, our review of which is subject to limitations imposed by Congress.

In 1999, a Massachusetts jury found James Garrey guilty of first-degree murder, and he was sentenced to life imprisonment.  Following his unsuccessful appeal to the Massachusetts Supreme Judicial Court (SJC), Garrey petitioned the United States District Court for the District of Massachusetts for relief pursuant to 28 U.S.C. § 2254.  In this appeal from the district court's denial of his habeas corpus petition, Garrey maintains that, in allowing the prosecution's peremptory strike of a minority-race juror, the state trial court committed error under Batson v. Kentucky, 476 U.S. 79 (1986), and Powers v. Ohio, 499 U.S. 400 (1991).  Garrey further asserts that the SJC both unreasonably determined facts and unreasonably applied federal law in affirming his conviction.  Concluding that neither the SJC's factual findings nor its application of the law was unreasonable, we affirm.

## I. BACKGROUND

We briefly set out the relevant facts underpinning Garrey's conviction and focus our recitation on the procedural history relevant to Garrey's Batson/Powers challenge. In doing so, where appropriate we draw upon the facts recited by the SJC, supplemented by other consistent record facts. Companionio v. O'Brien, 672 F.3d 101, 104 (1st Cir. 2012).

### A. Facts of Offense

In March 1997, Garrey went to a bar in Franklin, Massachusetts. Commonwealth v. Garrey, 436 Mass. 422, 425 (2002). Two of his coworkers, Corey Skog and Doreen D'Amelio (who were dating), were also at the bar. Id. at 424-25. Earlier that month, Garrey had found out that Skog had been having sexual relations with Garrey's former girlfriend. Id. at 424. At the bar, Garrey told D'Amelio that he "would kill to have a girl like you" and asked "would you mind if I hit [Skog]?" Id. at 425. Later that night, when Skog tried to leave the bar with D'Amelio, Garrey blocked the way and started punching Skog. Id. Skog fell to the ground and Garrey continued to punch him until one of Skog's friends pulled Garrey off. Id. Garrey then pulled out a knife and stabbed Skog. See id. at 426. Skog again fell to the ground, this time bleeding profusely, and Garrey kicked Skog's head three times. Id. After being forced out of the bar, Garrey tried to flee but was tackled by another of Skog's friends, who took the

- 3 -

knife and threw it away.  Id.  Skog ultimately died from the injuries, and Garrey was arrested.  Id.

## B. Jury Selection and Trial

During jury selection in Garrey's trial, the prosecution sought to use a peremptory strike on a minority-race prospective juror ("Juror 6-7").  Garrey, who is white, requested that the trial court inquire into the juror's dismissal.  The relevant exchange, repeated here in full, took place primarily among the trial judge, the prosecutor (Ms. Corcoran), and Garrey's counsel (Mr. Carney).

> Clerk:   Following juror please step down. You're being excused.  Panel 6, Juror No. 7 in Seat No. 14,[juror].  Panel 6 --
>
> Mr. Carney:  Your Honor, may I be heard?
>
> The Court:  Course you can.
>
> Mr. Carney:  Before she leaves.
>
> The Court:  Just one -- Mr. Officer.  Mr. Officer, please.  Could you bring the juror back in, please.
>
> BENCH CONFERENCE
>
> The Court:  Yes, you may, Counsel.
>
> Mr. Carney:  Your Honor, I would ask the Court to inquire further.  She is the only African-American juror that I see.  What is her number again?
>
> Ms. Corcoran:  Six-seven, your Honor.
>
> The Court:  I got to tell you that I didn't even catch that she was an African-American.
>
> Mr. Carney:  Well, I did, your Honor, and I believe she may be the only one in the entire

- 4 -

pool, and so I would ask that the Court inquire further as to the basis for the challenge.

The Court: Let me ask this question. The deceased nor the plaintiff are black people, is that --

Ms. Corcoran: Correct.

The Court: Are there any people of any color or ethnic diversity going to be testifying in this case?

Ms. Corcoran: I can't speak for the defense, your Honor. I don't know. For the Commonwealth, no. That had nothing to do with me --

The Court: Could you tell us what the reason is for the challenge.

Ms. Corcoran: If you're inquiring, yes, your Honor. Her husband is a guidance counselor at a public school. That was my reason. It has nothing to do with her race.

The Court: Counsel, please.

Mr. Carney: I respectfully submit that's an insufficient reason to challenge the only minority juror in the entire venire. We've had other people who are public employees, and I respectfully submit that's not a good enough reason to challenge, and I would ask that the challenge be disregarded.

The Court: Okay. As I understand it, Counsel, that the reason for your challenge, the reason for your challenge and the preliminary findings of the Court, is that the fact that the person's a guidance counselor, could you be a little more explicit in that.

Ms. Corcoran: Why, why I would not want a guidance counselor?

The Court: Yeah.

Ms. Corcoran: Because --

The Court: I'm not convinced this lady is a minority. I am not convinced of that.

Ms. Corcoran: I don't know if she is either, your Honor. I don't know what she is. I will tell you that that was not the reason that I challenged this woman.

The Court: Okay.

Ms. Corcoran: That was not the reason. That had nothing to do with it.

The Court: But the fact her husband is a guidance counselor?

Ms. Corcoran: Actually, her -- I'm looking at her occupation. It was her occupation. I'm sorry. I meant to say her occupation.

The Court: Okay. She's a guidance counselor.

Ms. Corcoran: Yes.

The Court: I'm sorry.

Ms. Corcoran: No, that was my mistake. I had said that initially. That was the reason, and I believe I have the right to challenge her. These aren't challenges for cause at this point.

The Court: That's true.

Ms. Corcoran: It's nothing to do with her race.

The Court: Counsel, do you wish to be heard further on that issue?

Mr. Carney: Yes, your Honor. The fact that a person serves as a guidance counselor has absolutely no impact on their ability to serve as a juror.

The Court: Oh, I can tell you that people's occupation, whether they're -- whether they're -- whether they're people who try and rehabilitate everybody and feel sorry for them and all that business can certainly be a

legitimate challenge on behalf of the Commonwealth or the defendant. You don't think?

Mr. Carney: Not in this case, your Honor.

Ms. Corcoran: I fully agree with your Honor, and that was the sole reason that I challenged this person.

The Court: Is there anything else you'd like to say for purpose of the record?

Mr. Carney: Yes. Your Honor, I do believe that this juror is a minority juror, and I do not see another minority juror in the venire.

Ms. Corcoran: I do. I do. I just looked as I was looking around. I see an Asian man that is seated on the jury. I see another man. I'm not sure if he's -- she's not the only one, your Honor.

The Court: Counsel, the question is do you want me to ask her whether she's a minority person?

Mr. Carney: If that would make a difference in your Honor's judgment, certainly.

The Court: Oh, I think that that's so difficult.

Mr. Carney: Well, then I think that the fact that one can see she is so dark hued in skin color and in her hair that it is obvious to me that she is African-American. Well, then I would ask that she be brought over and asked. It's the only way to settle it.

The Court: What does the Commonwealth ask the Court to do?

Ms. Corcoran: Your Honor, I would leave it to your discretion. I do not think it's necessary for this woman to come over, because that is not an issue that I had. I solely challenged her for that reason that I told the

Court, the fact that she is a guidance counselor.

The Court: Yes, as I -- as I sort of commented on it myself.

Ms. Corcoran: Because of the liberal attitude, and that's -- I mean, obviously, I am entitled to have perceptions when I'm choosing a juror, as defense does, and his argument is nullified by the fact that I -- there is an Asian man that I did not -- I don't know what defense is trying to assume at this point, that I'm taking all the minorities off the jury. There's an Asian man sitting in there. I'm cognizant of the fact that I'm in Norfolk County --

The Court: Is there anything further you'd like to ask the Court to do, sir?

Mr. Carney: No, your Honor. Thank you.

The Court: Do you ask the Court to inquire of this lady as to whether she's a minority?

Mr. Carney: Yes, your Honor.

The Court: For what reason, please?

Mr. Carney: Because the Court is not convinced that she is a minority.

The Court: That's correct. But really, if she is, assuming she's a minority, why wouldn't counsel for the Commonwealth have been stating a good and sufficient reason?

Mr. Carney: I submit the reason is not a good and sufficient reason to strike the only African-American man or woman off this jury.

The Court: Can I tell you, folks, for purposes of the record, the question is do we have to bring her over here. That's the question.

. . .

The Court: Hi, [Juror 6-7]. Could you come a little closer to me, please. My name is

- 8 -

Judge Tom Connolly, and your questionnaire indicates you're a guidance counselor for the Boston public schools.

The Juror: Yes.

The Court: Right there in downtown at Government Center.

The Juror: No, it is Jamaica Plain.

The Court: Oh.

The Juror: English High School in Jamaica Plain.

The Court: Oh, in Jamaica Plain, okay.

The Juror: Yeah.

The Court: [Juror 6-7], the only reason I ask this question is because of a ruling of the Supreme Judicial Court that encourages minorities to serve on juries, okay, and the question is whether or not you are a minority person, ethnically. It's a pretty stupid question to ask, I know that, but I just got to -- I got to ask for you.

The Juror: Yes.

The Court: Are you?

The Juror: Yes.

The Court: Okay. Can you step back with the officer, please. That was not the best phrased question, but I think it's the best I could do under the circumstances.

Mr. Carney: I agree. It was a perfectly appropriate question and asked with great sensitivity, the record should reflect.

Ms. Corcoran: I agree.

Mr. Carney: I'm serious.

Ms. Corcoran: I agree.

The Court:   Okay.   So, basically, as I understand this, counsel for the defendant is -- is asking for me to inquire of what the reasons were why this woman was struck and the answer given, that she was a guidance counselor at the Boston public schools. Counsel, is there anything further you'd like to say?

Mr. Carney:   No, your Honor. Thank you.

The Court:   And I also want the record to maintain that there is absolutely no minorities as either the victims, the witnesses or the defendant in this case.   I'm going to -- I'm going to allow the challenge on that finding.   I may very well make written findings on that issue before we finish this case.

Ms. Corcoran:   Let me just -- excuse me, your Honor.   As you were saying, then, the medical examiner, Manuel Montez, I believe is --

The Court:   Hispanic.

Ms. Corcoran:   Hispanic.

The Court:   Right.   But under our case law the people who are of Mexican or Spanish descent are not rated as a minority.

Ms. Corcoran:   Right.   And I just wanted to make that clear for the record.

The Court:   Thank you very much.

In April 1999, the empaneled jury found Garrey guilty of murder in the first degree.

## C. Procedural History

Garrey appealed to the SJC pursuant to Massachusetts General Laws chapter 278, section 33E, identifying a variety of errors made by the trial court, including the removal of Juror

- 10 -

6-7.  Garrey made two arguments as to why the trial court erred in allowing the prosecutor's peremptory challenge of a minority juror.

First, he contended that the trial judge contravened Batson by stating that guidance counselors might wish to "rehabilitate everybody and feel sorry for them."  Garrey argued that this comment ran afoul of Batson, which requires the trial judge to prompt the challenger to provide a neutral explanation for a peremptory strike, because the trial judge provided his own reasoning for the strike.

Second, Garrey argued that the explanation first advanced by the prosecutor -- that Juror 6-7 was a guidance counselor and thus likely had a "liberal attitude" -- was "per se" inadequate to deny a Black juror the right to sit on a jury.  He stressed that because the "record contained no legal or factual support for any such 'occupational attitudes,' it was error [for the judge] to accept the explanation."  Garrey also included a footnote that stated:  "Although the judge assumed that the case's lack of racial overtones was significant, . . . 'race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges.'"  (Quoting Powers, 499 U.S. at 416).  He made no further argument under Powers, nor any further argument that the trial judge had "allow[ed] the challenge" because no witnesses or parties were Black.

- 11 -

In 2002, the SJC denied Garrey's appeal and affirmed his conviction. Garrey, 436 Mass. at 424. In rejecting Garrey's challenge to the dismissal of Juror 6-7, the SJC addressed his argument that "the judge 'erred by supplying the missing detail' when he elaborated on the Commonwealth's reasoning for removing a guidance counsellor from the jury." Id. at 430. The SJC concluded that "[a]lthough it is inappropriate for a judge independently to suggest his or her own reason why a juror should not serve, the judge did not do so here." Id. (citation omitted). Instead, the trial judge "engaged both the prosecutor and defense counsel in a full discussion on the issue and provided defense counsel with the opportunity to argue whether the juror's occupation as a guidance counsellor was an adequate basis to challenge her." Id.

As to Garrey's second argument, the SJC determined that the prosecutor's challenge to Juror 6-7 "because she was a guidance counsellor was not per se inadequate." Id. at 429. It recognized that "[i]n some circumstances, a juror's occupation alone may be facially insufficient to rebut a prima facie showing that a peremptory challenge was improperly exercised." Id. But "[t]he converse is also true," the SJC explained. Id. (citing United States v. Maxwell, 160 F.3d 1071, 1075 (6th Cir. 1998) (concluding that juror's status as a guidance counselor is a "permissible reason[] for [a] strike" at step two of Batson)).

In a footnote, the SJC also commented that "[t]he fact that the defendant, the victim, and the witnesses were Caucasian was not dispositive of the [Juror 6-7 removal] issue, because the defendant is entitled to a jury selected by nondiscriminatory criteria, and prospective jurors are entitled to a discrimination-free jury selection process." Id. at 429 n.2.

Garrey petitioned for rehearing before the SJC in 2002. His petition was denied.

In 2003, Garrey filed a petition for a writ of habeas corpus in federal district court pursuant to 28 U.S.C. § 2254. In his habeas petition, he argued that "the record was bare of any support for a belief in the occupational attitudes of guidance counselors." He also argued that "the trial judge erred by suggesting the missing detail himself[,] which defeated the judge's ability to make an independent evaluation of the prosecutor['s] pretextual challenge." Garrey explained that the SJC's factual findings regarding this latter point were "contradicted . . . by the record," and as a result, "the state is not entitled to any presumption of correctness in such factfinding."

After Garrey filed his habeas petition, he returned to state court in 2004 to move for a new trial. His motion for a new trial was rejected by the trial court, and Garrey did not seek leave to appeal to the SJC. Garrey filed another motion for new

- 13 -

trial in 2012 that was denied in 2014. His appeal to the SJC was also denied. He then filed a petition for writ of certiorari and a motion for rehearing in the United States Supreme Court, both of which were denied in 2015.

Garrey's habeas case got off the ground in earnest in the district court in 2015. The case was assigned to a magistrate judge, who issued an order that Garrey should submit a memorandum to the court "setting out all of the grounds for relief he wishes to press along with the facts and the law to support each claim." In his memorandum responding to that order, Garrey argued that there was Powers error by the SJC and the trial court in addition to Batson error.

In due course, the magistrate judge entered a report and recommendation (R&R) concluding that there had been no Batson error but that the SJC had unreasonably applied Powers. As a result, the judge ordered further briefing to consider whether the Powers error prompted a harmless error or a structural error analysis. Subsequently, the magistrate judge entered another R&R recommending denial of Garrey's § 2254 petition, reasoning that Powers error is nonstructural under First Circuit precedent and concluding that here, the error was harmless. See Garrey v. Silva, No. 03-10562, 2020 WL 13830490, at *8-10 (D. Mass. Oct. 5, 2020) (discussing Chakouian v. Moran, 975 F.2d 931 (1st Cir. 1992), and United States v. Casey, 825 F.3d 1 (1st Cir. 2016)).

- 14 -

The district court adopted the magistrate judge's recommendations in part and dismissed Garrey's § 2554 petition. Garrey v. Kelley, 521 F. Supp. 3d 127, 129 (D. Mass. 2021). The district court first concluded that the SJC did not unreasonably apply Powers. Id. Specifically, the court reasoned that the SJC's view of the record was that (1) the trial judge found the prosecutor's strike of Juror 6-7 appropriate because of the juror's occupation and (2) the trial judge did not make his ruling based on racial identities of the juror and the defendant. Id. The district court characterized these findings as "not unreasonable" and also found that this was not an unreasonable application of Powers. Id. The district court further ruled that the SJC did not unreasonably apply Batson. Id. Thus, the district court dismissed Garrey's petition. Id. Garrey timely appealed.[1]

## II. DISCUSSION

On appeal, Garrey reprises his argument that the SJC unreasonably applied clearly established precedent, Powers and Batson, and unreasonably determined facts in affirming the state

---

[1] The district court granted a certificate of appealability (COA) as to the claim of a Powers violation because "the disagreement between judicial officers demonstrates that reasonable jurists can disagree as to whether a Powers error was committed," but denied a COA as to a Batson error. Garrey v. Kelly, 532 F. Supp. 3d 27, 29 (D. Mass. 2021). We granted Garrey's request for an expanded COA, certifying his claims pursuant to both Batson and Powers.

- 15 -

trial court's approval of the prosecutor's strike of the minority-race juror.  He thus urges us to reverse and remand with instructions to issue a writ of habeas corpus.  Where the district court did not engage in independent factfinding, as was the case here, we review the court's denial of a habeas petition de novo.  Rivera v. Thompson, 879 F.3d 7, 13 (1st Cir. 2018).  We can also affirm a district court's decision on any ground apparent from the record.  Gaskins v. Duval, 640 F.3d 443, 451 (1st Cir. 2011).

## A. Habeas Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. § 2254), governs a federal court's power to grant habeas relief.  Shoop v. Twyford, 596 U.S. 811, 818 (2022).  Under AEDPA, habeas relief may only be granted if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Gaskins, 640 F.3d at 451.  For purposes of AEDPA, "'clearly established Federal law' . . . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412 (2000).

- 16 -

Both "contrary to" and "unreasonable application of" have been given specific meanings. "[A] state-court decision is contrary to clearly established federal law if the state court employs a rule that contradicts an existing Supreme Court precedent or if it reaches a different result on facts materially indistinguishable from those of the controlling Supreme Court precedent." Janosky v. St. Amand, 594 F.3d 39, 47 (1st Cir. 2010). A court unreasonably applies clearly established law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Porter v. Coyne-Fague, 35 F.4th 68, 74 (1st Cir. 2022) (alteration in original) (quoting Williams, 529 U.S. at 413). Reasonableness in this context is not a question of "whether a federal court believes the state court's determination was incorrect." Shoop, 596 U.S. at 819. In fact, "even clear error will not suffice" for a grant of habeas relief. Porter, 35 F.4th at 75 (quoting White v. Woodall, 572 U.S. 415, 419 (2014)). Rather, it must be "so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Id. (quoting White, 572 U.S. at 427).

As to a claim that a state court's ruling was "based on an unreasonable determination of the facts," § 2254(d)(2), a "state court's findings on factual issues 'shall be presumed to be

correct' and the petitioner bears the burden of disproving factual findings by 'clear and convincing evidence,'" McCambridge v. Hall, 303 F.3d 24, 34-35 (1st Cir. 2002) (quoting 28 U.S.C. § 2254(e)(1)). This standard applies to factual findings by both trial and appellate state courts. Clements v. Clarke, 592 F.3d 45, 47 (1st Cir. 2010).

## B. **Batson/Powers** Challenge

With the deferential standard of review for habeas petitions in mind, we take up the SJC's treatment of Garrey's Batson and Powers claims. We first sketch the contours of the relevant guiding law.

"Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." Flowers v. Mississippi, 588 U.S. 284, 301 (2019). The Supreme Court in Batson operationalized this principle, explaining that "peremptory challenges may not be exercised on the basis of race." Sanchez v. Roden, 753 F.3d 279, 298 (1st Cir. 2014). Batson also laid out the appropriate framework for analyzing potentially race-based challenges. "First, the defendant must make a prima facie showing of discrimination in the prosecutor's launching of the strike." United States v. Bergodere, 40 F.3d 512, 515 (1st Cir. 1994) (citing Batson, 476 U.S. at 96-97). Then, at step two, "the prosecutor must proffer a race-neutral explanation for having challenged the juror." Id. At this step, the prosecutor needs

only to provide a reason that is, on its face, not explicitly racial. See Purkett v. Elem, 514 U.S. 765, 768-69 (1995) (per curiam). The prosecutor "must articulate a neutral explanation related to the particular case to be tried." Batson, 476 U.S. at 98. It does not matter if the explanation is "implausible or fantastic." Purkett, 514 U.S. at 768.

At step three, a court must examine "the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances," Flowers, 588 U.S. at 302, and "decide whether the defendant has carried the ultimate burden of proving that the strike constituted purposeful discrimination on the basis of race," Bergodere, 40 F.3d at 515. Step three therefore involves a "determin[ation of] whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." Flowers, 588 U.S. at 303. "The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.'" Id. (quoting Foster v. Chatman, 578 U.S. 488, 513 (2016)). However, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768.

Batson was motivated not only by a desire to protect the interests of defendants, but also by the need to "protect the rights of defendants and jurors, and to enhance public confidence

in the fairness of the criminal justice system." Flowers, 588 U.S. at 301. For this reason, the Supreme Court explained in Powers that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races." 499 U.S. at 402. Consequently, denying a defendant's objection to the strike of a juror "under the misimpression that the defendant must be of the same race as the stricken juror in order to raise a Batson challenge . . . runs afoul of Powers v. Ohio." Casey, 825 F.3d at 12 (citing Powers, 499 U.S. at 402).

Here, the SJC found that the trial court never explicitly specified whether Garrey had established a prima facie showing of discrimination, but -- given the trial court's inquiry into the prosecutor's reasoning for the challenge -- determined that this issue had become moot. See Garrey, 436 Mass. at 429. As neither party challenges this ruling, our review is limited to the SJC's affirmance and characterization of the trial court's Batson step-two and step-three analyses. In this regard, Garrey does not claim that the SJC's decision is "contrary to" Batson and its progeny. See 18 U.S.C. § 2554(d)(1). Instead, Garrey argues that where the SJC stumbled was in its determination of the facts and application of the law.

## 1. Unreasonable Determination of Facts

We turn to whether the SJC's adjudication of Garrey's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[2] This is a "demanding showing" that "cannot be made when 'reasonable minds reviewing the record might disagree' about the finding in question." Porter, 35 F.4th at 75 (alterations and nested quotation marks omitted) (quoting Brumfield v. Cain, 576 U.S. 305, 314 (2015)). Our factual inquiry in this context entails parsing the transcript of the venire proceeding before the trial court. See id. at 79 ("So framed, the issue before us reduces to a question of fact, that is, how to parse the prosecutor's explanation.").

The SJC began its analysis with the following factual summary of the Commonwealth's peremptory challenge:

> The defendant objected to the prosecutor's peremptory challenge of a prospective juror, claiming that she was the only African-American in the venire. The judge initially expressed doubt that she was

---

[2] Section 2254 also sets out a "more deferential standard," Smith v. Dickhaut, 836 F.3d 97, 101 (1st Cir. 2016), whereby "a determination of a factual issue made by a State court shall be presumed to be correct" and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence," 28 U.S.C. § 2254(e)(1). As Garrey does not prevail under § 2254(d)(2)'s "more petitioner-friendly standard," Smith, 836 F.3d at 101, we have no occasion to resolve any "tension" that might exist between the two overlapping subsections, Porter, 35 F.4th at 79.

African-American. After noting that neither the defendant nor Skog was African-American, the judge asked the prosecutor to provide a reason for the challenge. The prosecutor stated she was challenging the prospective juror because she was a guidance counsellor, and not because of her race. After some discussion, the judge agreed that an occupation in a rehabilitative field might be some indication of a prospective juror's inclination toward sympathy, and he allowed the challenge. In response to defense counsel's persistent concern that the prospective juror was indeed the only African-American in the venire, the judge asked her if she was a member of a minority group, to which she responded affirmatively. In concluding the matter, the judge noted that the victim, the witnesses, and the defendant were not members of a minority, and confirmed his decision.

Garrey, 436 Mass. at 427-28. The SJC wove additional factual findings into its application of Batson and Powers. See id. at 428-30. It found that "the [trial] judge ruled, without subscribing to the prosecutor's viewpoint, that because the juror was engaged in a rehabilitative occupation that probably called on her to show sympathy for human weakness, the prosecutor's challenge was legitimate." Id. at 430.

The SJC next found that "[t]he judge engaged both the prosecutor and defense counsel in a full discussion on the issue and provided defense counsel with the opportunity to argue whether the juror's occupation as a guidance counsellor was an adequate basis to challenge her." Id. "[T]he record," the SJC continued, "shows that the judge gave the matter meaningful consideration,

- 22 -

[and] we will not second-guess his decision." Id. (internal quotation marks omitted). The SJC also noted in a footnote that "[t]he fact that the defendant, the victim, and the witnesses were Caucasian was not dispositive of the issue, because the defendant is entitled to a jury selected by nondiscriminatory criteria, and prospective jurors are entitled to a discrimination-free jury selection process." Id. at 429 n.2 (citing Powers, 499 U.S. 400).

Garrey argues that the trial transcript contradicts these findings. Our own review, however, leads us to conclude that they are at least findings about which "reasonable minds reviewing the record might disagree." Brumfield, 576 U.S. at 314. That brings us to the end of the road under § 2254(d)(2).

Garrey first takes up the SJC's finding that "[t]he fact that the defendant, the victim, and the witnesses were Caucasian was not dispositive of the issue." Garrey, 436 Mass. at 429 n.2. He points out that the trial judge, immediately after observing that "there [are] absolutely no minorities as either the victims, the witnesses or the defendant in this case," stated: "I'm going to allow the challenge on that finding."

Garrey is correct that if "that finding" is interpreted to refer to the trial judge's observations about the racial composition of the trial participants, that reading contradicts the SJC's somewhat ambiguous finding that that status was "not dispositive." Garrey, 436 Mass. at 429 n.2. But we are not

- 23 -

persuaded that no other interpretation is reasonable. "That finding" could also plausibly refer back to the trial judge's prior statement that "the answer given" by the Commonwealth in response to the court's questioning was that the juror was struck because she "was a guidance counselor at the Boston public schools." Even though the trial judge proceeded to mention the racial composition of the trial participants, he prefaced that remark with, "[a]nd I also want the record to maintain that . . . ." This phrasing, particularly the use of "[a]nd" and "also," suggests that the judge's racial composition observation may have been made to record a separate, additional point -- possibly that Commonwealth counsel had no litigation motive to exclude any juror on the basis of race. As such, the observation could reasonably be understood not as the judge's rationale for allowing the challenge but to reinforce the judge's previous statement that the prosecutor's challenge was motivated by the acceptable guidance-counselor rationale.

Although the transcript does not allow us to reconstruct this element of the trial judge's reasoning with perfect confidence, it at least supports a reasonable inference that the trial judge meant to (1) restate the guidance-counselor rationale for striking the juror, (2) pause to clarify a separate observation for the record, and (3) state his reliance on the guidance-counselor rationale as the basis for concluding that the Commonwealth's challenge was allowable.

We do not suggest that this is the only reasonable inference the SJC could have drawn. The trial transcript -- which elides crucial interpretive cues like tone and gesture -- does not permit a definitive conclusion as to what the trial judge meant by "that finding." See Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 229 (1st Cir. 2016) (observing that "[w]e are well-aware of the dangers of trying to glean tone of voice and demeanor from a cold transcript" but consulting "the timing and wording of the judge's statements" to ascertain how "the record could be read"). But even if it is more likely that the trial judge meant "that finding" to refer to his statement about racial composition, § 2254(d)(2) requires Garrey to show more than just comparative likelihood. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). All told, we cannot conclude that it was unreasonable for the SJC to find that "[t]he fact that the defendant, the victim, and the witnesses were Caucasian was not dispositive of the issue." Garrey, 436 Mass. at 429 n.2.

Garrey also challenges as unreasonable the SJC's finding that the trial judge did not "independently . . . suggest his . . . own reason why a juror should not serve." Garrey, 436 Mass. at 430. As above, one plausible reading of the transcript

supports a finding that contradicts the SJC's. After counsel for the Commonwealth stated that she premised her peremptory challenge on the stricken juror's occupation as guidance counselor, the trial judge elaborated as follows:

> Oh, I can tell you that people's occupation, whether they're -- whether they're -- whether they're people who try and rehabilitate everybody and feel sorry for them and all that business can certainly be a legitimate challenge of behalf of the Commonwealth or the defendant. You don't think?

Garrey frames this as a straightforward demonstration that "the judge suggested the reason [for the prosecutor's challenge] himself." That framing, however, depends on a particular definition of "the reason" for the Commonwealth's challenge. We are not prepared to say that the SJC, which took a narrower view of "the reason," did so unreasonably.

The SJC's reasoning makes clear that it believed that the Commonwealth attorney actively volunteered a "reason" for her challenge when she stated -- without elaboration -- that the juror worked as a guidance counselor. Garrey, 436 Mass. at 430. The SJC appears to have found that the trial judge both engaged in a permissible step-three Batson analysis and did not supplant the prosecutor's role at step two by expounding on why someone's occupation as a guidance counselor would be a non-pretextual basis for a challenge. "After the judge required the prosecutor to justify her challenge," the SJC explained, "he was required to

- 26 -

make an independent evaluation of the prosecutor's reasons and to determine specifically whether the explanation was bona fide or a pretext." Garrey, 436 Mass. at 430 (emphasis added) (citation modified).

These findings were reasonable. When a prosecutor offers a race-neutral explanation for raising a peremptory challenge at Batson's second step, that explanation is not held to a high standard of elaboration. See Purkett, 514 U.S. at 767-68 ("The second step of this process does not demand an explanation that is persuasive, or even plausible."); see also Hollis v. Magnusson, 32 F.4th 1, 5 (1st Cir. 2022) (affirming the denial of a habeas petition where the prosecutor's step-two explanation was, "I was looking for his level of education and other various factors that were provided in the list from the court.").

Against this background, the prosecutor's guidance-counselor reason was readily identifiable as the type of clipped statement that might comprise the beginning and end of Batson's second step. It was thus not unreasonable for the SJC to interpret the trial judge's subsequent comment about the legitimacy of such a justification as a step-three judicial analysis of the sufficiency of the prosecutor's tendered reason. Even if we cannot be certain that the SJC accurately read the trial judge's observations about the role of a guidance counselor as an inquiry into the pretextual nature of the prosecutor's

- 27 -

guidance-counselor explanation, we can at least say that the SJC made a reasonable finding based on the record before it. That means that Garrey cannot prevail under 28 U.S.C. § 2254(d)(2).

The reasonableness of the SJC's finding on this point also leads us to reject Garrey's contention that "[a]s to step three, the SJC made no ruling to defer to."[3] Indeed, it appears that the SJC made just such a ruling. The SJC explained that "[h]ere, the judge ruled, without subscribing to the prosecutor's viewpoint, that because the juror was engaged in a rehabilitative occupation that probably called on her to show sympathy for human weakness, the prosecutor's challenge was legitimate." Garrey, 436 Mass. at 430. The SJC also explained that "[t]he judge engaged both the prosecutor and defense counsel in a full discussion on the issue and provided defense counsel with the opportunity to argue whether the juror's occupation as a guidance counsellor was an adequate basis to challenge her." Id.

These explanations go directly to the question of whether "at step three, the court [has] assess[ed] the prosecutor's explanation, along with other relevant factors, to 'determine if

---

[3] It is questionable whether Garrey's claim that the trial court failed to make a step-three finding was sufficiently raised to the district court; rather, it appears Garrey's petition focused on the potential Powers error and the purported pretextual nature of the prosecutor's justification. However, even assuming Garrey's challenge was properly preserved below, it nevertheless -- as we explain above -- lacks merit.

- 28 -

the defendant has established purposeful discrimination.'" Yacouba-Issa v. Calis, 22 F.4th 333, 334 (1st Cir. 2022) (quoting Batson, 476 U.S. at 98).

The SJC could have elaborated more on its ruling that the trial judge adequately supported its step-three analysis. Our review, however, is limited to whether the SJC made an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The SJC retraced the trial judge's reasoning for accepting the race-neutral reason tendered by the prosecutor and also noted that the judge gave each party an opportunity to challenge that acceptance. That is not tantamount to ignoring step three of Batson altogether. In sum, we are satisfied that Garrey has not met his considerable burden of demonstrating that no "reasonable minds reviewing the record" could possibly "disagree about the finding in question." Brumfield, 576 U.S. at 314 (alteration and internal quotation marks omitted).

## 2. Unreasonable Application of Federal Law

Garrey also contends that the state court's decision involved an unreasonable application of Batson's second and third steps and the holding in Powers. See 28 U.S.C. § 2254(d)(1). As discussed above, he argues that the prosecutor failed to provide a sufficient step-two explanation for the challenge and that, even assuming the trial court made a Batson step-three determination,

the context of the strike demonstrates that the prosecutor's given reason was pretextual. Moreover, Garrey contends that the trial court violated Powers by allowing the prosecutor to strike Juror 6-7 on the ground that Garrey, the victim, and trial witnesses were all not of a minority race. These arguments do not carry the day.

First, it was not unreasonable for the SJC to conclude that the prosecutor provided an adequate basis for her peremptory challenge. See Garrey, 436 Mass. at 429. Garrey resists this conclusion, emphasizing that (1) the prosecutor's "initial bald denials" of discriminatory intent are an insufficient justification for a strike under Batson and (2) the explanation for the strike must come from the prosecutor, not the judge as, in Garrey's view, was the case here. It is true that a prosecutor may not "rebut the defendant's [prima facie] case merely by denying that he had a discriminatory motive." Batson, 476 U.S. at 98. But the prosecutor's explanation for her strike was not limited to cursory denials. The prosecutor, when prompted to provide the basis for her challenge, pointed immediately to the juror's occupation. As explained in detail above, the brevity of the prosecutor's explanation is not fatal to Garrey's conviction. While an in-depth explanation may assist a trial court in evaluating the persuasiveness of a prosecutor's stated justification at step three, the prosecutor need do nothing more

than identify the race-neutral grounds for the strike to satisfy the prosecution's burden at step two. See Sanchez v. Roden, 808 F.3d 85, 90 (1st Cir. 2015) ("[W]e easily affirm the district court's finding that [the prosecutor's] explanation -- that he struck Juror 261 because of his age -- is race-neutral and satisfies the state's burden at step two to articulate a nondiscriminatory reason for the strike." (citation omitted)).

Garrey also attempts to repackage his challenge to the SJC's factual finding that the prosecutor (not the trial court) provided the basis for her strike by arguing that the prosecution failed to meet its burden under Batson step two. To the extent that this argument differs from Garrey's challenge to the SJC's factual determinations addressed and rejected above, those differences do little to swing the balance in his favor. Of course, the trial court's "substitution of a reason for eliminating [the prospective juror] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions." Miller-El v. Dretke, 545 U.S. 231, 252 (2005). However, as we previously have explained, it was reasonable for the SJC to find that the prosecutor supplied the step-two justification and that the trial court's comments about the prospective juror's occupation were simply made when evaluating whether that justification was pretextual. See Garrey, 436 Mass. at 430.

Second, having accepted the SJC's finding that the trial court performed a Batson step-three analysis, we consider and reject Garrey's argument in the alternative that the state courts should have found the prosecutor's rationale to be pretextual because of the prosecutor's "shifting justification" from the assertion that Juror 6-7's husband was a guidance counselor to the explanation that it was the juror herself who was a guidance counselor. It is true that a "shifting rationale for the strike could support an inference that [the given] reason was [not] genuine." United States v. Bowles, 751 F.3d 35, 38 (1st Cir. 2014) (citing Purkett, 514 U.S. at 769). But Garrey -- who bears the burden of persuasion -- provides no explanation for why such an inference would be appropriate here. This is not an instance where the prosecution changed its justification from one reason to another of an entirely different nature. See Foster, 578 U.S. at 507-09 (stating that the prosecution's shifting reasons for a strike, which changed from the similarity between the prospective juror's son and the defendant to juror's religious objections to the death penalty, suggested that those reasons were pretextual); Bowles, 751 F.3d at 38 (finding counsel's response to court raised possibility of pretext where counsel's explanation for peremptory challenge changed from "nothing to do with the fact she's Asian American," to "I don't like her," to ultimately "[h]er age"). Any "shift" in the Commonwealth's reasoning was modest, since the

impetus for the prosecution's objection, at its core, remained the same: the exclusion of a person who either was, or had close contact with someone who was, a guidance counselor in a public school.

Nor can we agree with Garrey's characterization of the prosecutor's mistake as a "misstate[ment of] the record" that can be viewed as a "clue showing discriminatory intent." See Flowers, 588 U.S. at 314. The prosecutor made the misstatement and, when asked again by the trial court to explain her basis for the peremptory challenge, corrected the record of her own volition. A mistake of this nature is not the kind that reveals a neutral justification is actually a pretext for racial discrimination. See id. (finding it "telling" that prosecutor made "a series of factually inaccurate explanations" relating to several prospective jurors such that at times the judge had to correct on the record). As the Supreme Court has explained, "the back and forth of a Batson hearing can be hurried, and prosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination."[4] Id.

---

[4] Garrey also contends that the Commonwealth's stated reason for the strike was pretextual because the juror's occupation bore no relation to the case given that there was no evidence the juror believed in rehabilitation or would otherwise be sympathetic to him. Even assuming only a marginal correlation between the juror's

- 33 -

Finally, Garrey's claim of Powers error, while perhaps facially attractive, ultimately tarnishes upon closer inspection. As noted above, Garrey argues that the SJC's mention of Powers in a footnote and its failure to address how the race of the defendant, witnesses, and the victim was discussed by the trial court was an unreasonable application of Powers. We acknowledge that the SJC's discussion of Powers was brief. However, "[o]ur 'highly deferential standard for evaluating state court rulings' requires that we read the SJC's opinion in such a way as to give its choice of language 'the benefit of the doubt.'" Ayala v. Alves, 85 F.4th 36, 58 (1st Cir. 2023) (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002)). As such, we "review[] the full context" of a state court "decision to determine that the state court implicitly addressed an issue despite not explicitly saying it was doing so." Id. (describing Bell v. Cone, 543 U.S. 447, 455 (2005) (per curiam)). Here the SJC found, at least implicitly, that the trial court engaged in some preliminary discussion about the prosecutor's peremptory challenge after the petitioner objected to it, asked the prosecutor to state her reason

---

occupation and her potential to favor a criminal defendant, we can easily conclude that the connection is not so attenuated so as to make the SJC's affirmance unreasonable. Cf. Dolphy v. Mantello, 552 F.3d 236, 239 (2d Cir. 2009) (holding that trial court failed to properly apply Batson because, even though prosecution had offered a facially race-neutral justification, "it rested precariously on an intuited correlation between body fat and sympathy for person accused of crimes").

for the peremptory challenge without first making a formal step-one finding, and then concluded that the prosecutor's reason was legitimate in light of all relevant circumstances. See Garrey, 436 Mass. at 429-30. In discussing the trial court's having proceeded to Batson step two before making a step-one determination, the SJC included the footnote, described above, that "[t]he fact that the defendant, the victim[,] and the witnesses were Caucasian was not dispositive of the issue, because the defendant is entitled to a jury selected by nondiscriminatory criteria, and prospective jurors are entitled to a discrimination-free jury selection process." Id. at 429 n.2. Read in context, this citation to Powers suggests that the SJC concluded that the trial judge asked the prosecutor for her reason for the strike rather than ending the Batson inquiry at step one simply because Garrey, the victim, and the witnesses were not of the same race as the juror. This conclusion fully comports with Powers' holding.

That the trial court otherwise inquired into the race of the potential juror does not a Powers error make. The SJC observed that the trial court noted at the beginning of the relevant colloquy that Garrey and the victim were white and then, toward the end of his discussion with the parties, "that the victim, the witnesses, and the defendant were not members of a minority, [before he] confirmed his decision." Id. at 427-28. The

references to the defendant's race thus, the SJC found, occurred at step one and step three of the Batson framework.

It was not an unreasonable application of Batson and Powers for the SJC to affirm Garrey's conviction, given the context in which these discussions arose. The persuasiveness of the prosecutor's justification and evidence of discriminatory intent is a "fact-driven evaluation of all the relevant circumstances."[5] Sanchez, 808 F.3d at 90 (citing Miller-El v. Cockrell, 537 U.S. 322, 339 (2003)); see also Synder v. Louisiana, 552 U.S. 472, 478 (2008) (noting that when considering a Batson challenge, "all of the circumstances that bear upon the issue of racial animosity must be consulted"); Batson, 476 U.S. at 93 ("[A] court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977))). As such, while Powers prohibits trial courts from using difference in race to prevent a defendant from raising a Batson objection, other circuits have approved consideration of the race of the defendant, the victim, the witnesses, and the potential juror in

---

[5] Other such relevant circumstances, not specifically addressed by the SJC but still apparent on the record, include the prosecutor's voluntary clarification that there was one witness who was Hispanic and her stated lack of awareness as to the race of the prospective juror. These record facts tend to support the credibility of the prosecutor and, by extension, the reasonableness of the state courts' decisions upholding the peremptory challenge.

performing step-one and step-three analyses. See, e.g., Brinson v. Vaughn, 398 F.3d 225, 233 (3d Cir. 2005) (noting that "the race of a victim, the witnesses, and the defendant may be relevant [to a Batson challenge] because these facts may have a bearing on a prosecutor's motivation to use racially based strikes in a particular case"); Keel v. French, 162 F.3d 263, 271 (4th Cir. 1998) ("While the defendant need not be a member of the same race as the excused jurors in order to raise a Batson challenge, that [the defendant] and the jurors are of different races eliminates the argument that the jurors sympathize with the defendant because they share the same race." (citation omitted)); United States v. Stephens, 421 F.3d 503, 518 (7th Cir. 2005) (listing as relevant to Batson step-one inquiry the fact that "the defendant was African-American and all of the witnesses were Caucasian"); United States v. Smith, 788 F. App'x 654, 655-56 (11th Cir. 2019) (explaining factors a district court should consider when assessing a claim of discrimination as part of a Batson challenge, including "the race of the defendant, and the racial composition of the remaining pool of potential jurors"). That other courts have found these factors relevant in a Batson analysis only bolsters our conclusion that the SJC's decision here was reasonable. See Linton v. Saba, 812 F.3d 112, 126 (1st Cir. 2016) ("That this Court and other circuits have used language and analysis in line with that used by the SJC adds further force to

- 37 -

the conclusion that the SJC's formulation is not one with which 'fairminded jurists' could not agree.").

In short, the trial court's discussion of Garrey's, the witnesses', the victim's, and the prospective juror's races can reasonably be read as having occurred as part of the court's fact-intensive step-three analysis. Garrey's ability to raise his Batson challenge was never questioned by the trial court, and thus we fail to find a Powers error. See, e.g., Casey, 825 F.3d at 11-13 (finding Powers error where district court denied defendant's Batson challenge on the ground that, inter alia, potential juror had not identified as the same race as defendant and thus defendant had not made "prima facie case of purposeful discrimination").

### III. Conclusion

Although we have determined that the SJC could reasonably view the trial judge's performance of the three-step Batson inquiry here as adequate and complete, we acknowledge that the trial court could easily have more clearly followed the Batson procedure and explicitly stated a ruling on each of the three prongs: first, that the defendant had established a prima facie showing of discrimination based on the juror's race; second, that the prosecutor had provided a race-neutral explanation for the juror challenge; and third, that the court found no pretext based on explicitly stated factors that led the judge to that conclusion.

- 38 -

Nothing in this opinion should be read as endorsing the more casual and truncated approach employed by the trial court in this case. That being said, for the reasons described above, the judgment of the district court is **affirmed**.